**SO ORDERED.**

**SIGNED this 14 day of August, 2007.**



_____
Dale L. Somers
**UNITED STATES BANKRUPTCY JUDGE**

_____

OPINION DESIGNATED FOR ON-LINE PUBLICATION BUT NOT PRINT PUBLICATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In Re:<br><br>**YOUSSEF MOHAMAD YOUSSEF,**<br><br>        DEBTOR. | CASE NO. 05-17457<br>CHAPTER 7 |
| **G.E. MONEY BANK,**<br><br>        PLAINTIFF,<br><br>v.<br><br>**YOUSSEF MOHAMAD YOUSSEF,**<br><br>        DEFENDANT. | ADV. NO. 06-05053 |

**MEMORANDUM OPINION AND ORDER DENYING
DISCHARGEABILITY COMPLAINT**

On December 5, 2006, trial was held on the Complaint to Determine Dischargeability filed by G.E. Money Bank. Plaintiff G.E. Money Bank (hereafter "Bank") appeared by Jeffrey C. McDaniel of Brooks & Trinrud, Rock Island, Illinois. Defendant Youssef Mohamad Youssef (hereafter "Debtor") appeared by M. Steven Wagle, Law Office of M. Steven Wagle, P.A., Wichita, Kansas. There were no other appearances. This Court has jurisdiction.[1] Following the close of evidence and after hearing the arguments of counsel, the Court took the matter under advisement. For the reason stated below, the Court denies the Complaint and finds that Bank's credit card claim is dischargeable.

**NATURE OF THE CASE.**

The Bank's complaint alleges that because of fraud Debtor should be denied discharge pursuant to 11 U.S.C. § 523(a)(2)(A)[2] for $10,169.85, the principal balance due on an Ultimate Electronics credit card issued by Bank. Plaintiff seeks judgment against Debtor for the amount of the claim, plus interest, attorney fees, and costs. As the charge of $7,976.99 for electronics and other miscellaneous items, made within 60 days pre-petition, Bank contends it is entitled to the presumption of nondischargeablity provided by § 523(a)(2)(C) for purchases of luxury goods

---

[1] This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. A complaint to determine the dischargeability of a particular debt is a core proceeding which this Court may hear and determine as provided in 28 U.S.C.§ 157(b)(2)(I). There is no objection to venue or jurisdiction over the parties.

[2] This case was filed before October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 become effective. All statutory references to the Bankruptcy Code are to 11 U.S.C. §§ 101 - 1330 (2004), unless otherwise specified. All references to the Federal Rules of Bankruptcy Procedure are to Fed. R. Bankr. P. (2004), unless otherwise specified.

and services.  Debtor responds that he had every intention of paying for the goods purchased, made no misrepresentations to the Bank, and he is not responsible for interest or attorney fees. Debtor also contends the items purchased within 60 days before the petition date were not luxury goods.

**FINDINGS OF FACT.**

Debtor's credit card account with Bank was opened in July 2005.  The offer of credit was made to Debtor by an employee of Ultimate Electronics, at the Ultimate Electronics store in Wichita.  The application was completed at the store.  Debtor was given a statement of the terms and conditions of the account.[3]  There is no evidence that either Ultimate Electronics or Bank, as the issuer of the card, made any investigation of Debtor's financial status, either by an application completed by Debtor or through a credit check.  The credit limit was $10,000.

Debtor's first use of the card was on July 23, 2005, when he made purchases of miscellaneous electronic items for $321.85.  On August 8, 2005, Debtor used the card for the purchase of a digital camera, including printer, costing $2,192.86.  Debtor's camera had broken about a year previously, and his family wanted a camera for family pictures.  The August account statement sent to Debtor showed a balance due of $2,514.71 and a minimum payment due of $65.  Debtor's minimum payment was posted on August 26, 2005, before the due date of September 14, 2005.  Debtor also received credit of $96.57 for a returned item.  On September 2, 2005, Debtor used the card to purchase a stereo system for primarily family use, costing $3,615.55.  On September 17, 2005, Debtor received return credit of $75.06.  On September 19,

---

[3] The credit card statements evidence an interest rate of 22.98%.  However, no finance charges were posted on Debtor's purchases, that appear to have been made pursuant to a retailer promotion.

3

2005, Debtor used the card to purchase a 42 inch flat screen television costing $4,361.44. The stereo system and the television replaced very old equipment Debtor's family was using. The September statement from Bank showed a minimum payment of $169 due on October 14, 2005. On October 1, 2005, Bank posted the minimum payment, but the check bounced, and the credit was reversed.[4] Bank in its Complaint asserts an unsecured claim for the card balance on the date of filing of $10,169.85.[5]

Debtor, a naturalized citizen who has lived in the United States for 19 years, is married and has three children. He has lived at the same address in Wichita for seven years. In August 2005, Debtor was the owner/operator of a Wichita restaurant, formerly know as Café Mediterranean and then renamed Kababji, which he had opened in 2001 and operated through Y & Y, Inc., a Kansas corporation. His income from employment or operation of a business in 2004 was $42,250, and through the first part of October, 2005 Debtor had earned $33,247. Debtor's Schedule I showed monthly net income of $3,097 and Schedule J showed monthly expense of $2,779.67, a difference of $317.33. Although Debtor's wife helps out at the restaurant and earns approximately $1,500 to $2,000 per month as a musician, neither her income nor her expenses were shown on the schedules.

In the past, Debtor had owned, operated, and then sold approximately six restaurants. In August 2005, Debtor responded favorably to a proposal that he exchange his current restaurant for $85,000 cash and a smaller restaurant he had previously operated. It was an opportunity to

---

[4] After the purchase of the television and the imposition of a bad check fee of $29.00, the $10,000 credit limit was exceeded by $284.07.

[5] The October 15, 2005 statement shows a balance due of $10,284.07. The discrepancy between this amount and the amount alleged in the Complaint is not explained.

reduce staff and rent. Although inventories were completed, that proposal did not result in final agreement. The Debtor's landlord then located a potential buyer who would have hired Debtor to operate a tapas restaurant at the same location. In late September, the interested purchasers were on the premises when Debtor's employees were present, and rumors regarding possible sale circulated. Several employees resigned, and the business suffered. The sale did not go forward.

About two weeks before October 11, 2005, apparently at the time when the second sale proposal fell though, Debtor contacted the bankruptcy attorney who later filed his petition. They talked by phone. As an aspect of prepetition planning, Debtor sold unneeded restaurant equipment to his brother and an acquaintance. Debtor first met with counsel on October 6, 2005, and the petition was filed October 11, 2005. As of the date of filing, Debtor's unsecured debt, which was primarily credit card balances, was $222,342.00. The unsecured claims included rent for the restaurant of $20,000, comprised of advance rent of $9,000 per month for September and October, plus some amounts due for prior months when only partial payments had been made.

On October 18, 2005, there was an article in the Wichita newspaper about Debtor's restaurant stating that Debtor "was now looking to file bankruptcy and possibly sell the restaurant." This prompted the defection of additional employees, and the restaurant closed about two weeks after the bankruptcy filing.

When the credit card account with Bank was opened July 2005, Debtor had approximately 20 open credit card accounts with an aggregate balance of about $200,000. Some, but not all, of the accounts, were at the applicable credit limits. Debtor paid the minimum amount due on each account each month, either by withdrawals from his personal checking account, utilizing credit available on one card to pay the minimum on another, or transfer of

5

assets of his business. Debtor testified that he intended to pay Bank for each of the purchases made. In July, 2005, in an effort to reduce his monthly payments, Debtor took advances on credit cards and used them to pay down his home mortgage, thereby reducing the monthly mortgage payments. The total monthly minimum payments on all cards were about $1,800 to $2,000, considerably more than the difference between Debtor's monthly income and expenses, as shown on his Schedules I and J. Nevertheless, Debtor testified that prior to October, 2005, he had assets of $4,000 to $5,000 to pay his debts and the restaurant was operating normally.

Debtor first realized that he would not be able to pay his credit card debt when he could not sell his business. If the exchange of restaurants proposed in August had occurred, he would have received $85,000 cash and, according the Debtor, there would have been no reason to file bankruptcy. The sale contemplated in September, whereby Debtor would continue as the manager of his present business, also was a very good option.

**ANALYSIS AND CONCLUSIONS OF LAW.**

   **A. Objections to dischargeability pursuant to § 523(a)(2)(A).**

Subsection 523(a)(2)(A), the basis for Bank's dischargeability Complaint, provides as follows:

> (a) A discharge under section 727 . . . of this title does not
> discharge an individual debtor from any debt –
> \* \* \*
> (2) for money, property, services, or an extension, renewal, or
> refinancing of credit, to the extent obtained by --
>  (A) false pretenses, a false representation, or actual fraud, other
> than a statement respecting the debtor's or an insider's financial
> condition;

6

The Supreme Court in *Field v. Mans* construed § 523(a)(2)(A) to incorporate the general common law of torts as stated in the Restatement (Second) of Torts (1976).[6] The Tenth Circuit BAP, following the *Field v. Mans* analysis, when considering whether alleged misrepresentations were sufficient to deny discharge of credit card debt, relied on the Restatement § 525, addressing liability for fraudulent misrepresentation.[7] It provides:

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.[8]

A misrepresentation is fraudulent if the maker has knowledge of the untrue character of his representation.[9] The frauds included within misrepresentations sufficient to deny discharge must "involve moral turpitude or intentional wrong; fraud implied in law, which may be established without imputation of bad faith or immorality, is insufficient."[10] Fraudulent intent need not be shown by direct evidence and may be inferred from the circumstances. "The bankruptcy court must consider whether the totality of the circumstances 'presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor.'"[11]

---

[6] *Field v. Mans*, 516 U.S. 59, 70-72 (1995).

[7] *Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 783-84 (10th Cir BAP 1998).

[8] Restatement (Second) of Torts § 525 (1976).

[9] *Id.* at § 526, cmt. a.

[10] 4 *Collier on Bankruptcy* ¶ 523.08[1][d] (Alan N. Resnick & Henry J. Sommer eds.-in-chief, 15th ed. rev. 2007).

[11] *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000), *quoting* 3 William L. Norton, Jr., *Norton Bankruptcy Law and Practice 2d* 47:16, n. 62 (1999).

7

Establishing an exception to discharge based upon misrepresentation is often stated to require the following elements: (1) The debtor made a representation; (2) at the time of the representation, the debtor knew it to be false; (3) the debtor made the representation with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained the alleged loss and damage as a proximate result of the representation having been made.[12] The Creditor has the burden of proof on all elements by a preponderance of the evidence.[13] Courts generally construe the exceptions to discharge liberally in favor of the debtor; the reasons to deny discharge must be substantial.[14] This construction assures the fresh start of the honest but unfortunate debtor.[15]

These elements of fraud are difficult to apply to the credit card context.[16] The transactions which create the debt usually do not involve the card issuer directly and occur after the credit card agreement has been made. For purposes of § 523(a)(2)(A), the use of the card gives rise to a representation of intent to repay the amounts charged, but does not give rise to an implied representation of ability to pay.[17] "An implied representation of intent to repay will be

---

[12] *E.g., Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir. 1996) (stating five elements but requiring that creditor's reliance be reasonable); *Field v. Mans*, 516 U.S. at 74 (holding that creditor reliance must be justifiable).

[13] *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

[14] *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir. 1994).

[15] *Id.*

[16] *See* 4 *Collier on Bankruptcy* ¶523.08[6]; Margaret Howard, *Shifting Risk and Fixing Blame: The Vexing Problem of Credit Card Obligations in Bankruptcy*, 75 Am. Bankr. L.J. 63 (2001).

[17] *In re Kukuk*, 225 B.R. at 785-86; *Mercantile Bank v. Hoyle (In re Hoyle)*, 183 B.R. 635, 638 (Bankr. D. Kan. 1995); *Chase Bank, USA v. Hickman (In re Hickman)*, Case 05-25265; Adv. No. 05-6242 (Bankr. D. Kan. Oct. 31, 2006, Somers, J).

8

fraudulent if the credit card issuer demonstrates that at the time the debtor used a credit card he or she had no intent to repay the debt incurred."[18] "This issue requires a determination as to whether the debtor subjectively intended to repay the debt when he or she made the implied representation that in fact he or she intended to do so."[19] The debtor's intention to mislead the creditor need not be proven with direct evidence; it may be inferred from the totality of the circumstances. The following is a nonexclusive list of factors frequently considered by the courts:

> (1) the length of time between the charges made and the filing of bankruptcy; (2) whether the debtor consulted an attorney regarding bankruptcy prior to the charges being made; (3) the number of charges made; (4) the amount of the charges; (5) the financial condition of the debtor at the time the charges were made; (6) whether the charges were above the credit limit of the account; (7) whether the debtor made multiple charges on any given day; (8) whether or not the debtor was employed; (9) the debtor's employment prospects; (10) the debtor's financial sophistication; (11) whether there was a sudden change in the debtor's buying habits; and (12) whether the purchases were made for luxuries or necessities.[20]

All of the circumstances must be considered; "the focus should not be on whether the debtor was hopelessly insolvent at the time he made the credit card charges."[21]

**B. The presumption of nondischargeability under § 523(a)(2)(C).**

When applicable, § 523(a)(2)(C), on which Bank relies, reduces the burden on the credit card issuer. It provides:

---

[18] *In re Kukuk*, 225 B.R. at 786.

[19] *Id.*

[20] *Id.; accord In re Hoyle*, 183 B.R. at 638.

[21] *Anastas v. Amer. Savings Bank (In re Anastas)*, 94 F.3d 1280, 1285 (9th Cir. 1996).

9

> (C) For purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $1,225 for "luxury goods or services" incurred by an individual debtor on or within 60 days before the order for relief under this title . . . are presumed to be nondischargeable; "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the Consumer Credit Protection Act.

This provision was enacted in 1984 "to deter debtors from purchasing exemptable items with credit in contemplation of bankruptcy."[22] A creditor bears the burden of showing, by a preponderance of the evidence, that the nondischargeability presumption applies to its claim.[23] The debtor may then rebut the presumption. The debtor's burden is determined in light of the purpose of the presumption. "Congress' motive for adding § 523(a)(2)(C) to the Bankruptcy Code in 1984 was to rectify a perceived practice by debtors of 'loading up,' or going on credit buying sprees in contemplation of bankruptcy."[24] The section "presumes that the debtor purchased the items without intending to pay for them."[25] To rebut the presumption of fraudulent intent, the debtor therefore must directly attack the presumed fact and raise substantial doubt in the mind of the trier of fact as to the existence of the presumed intent.[26] The presumption can therefore be rebutted by evidence that the "portion of such claim was not

---

[22] *J.C. Penney Co., Inc. v. Leaird (In re Leaird)*, 106 B.R. 177, 179 (Bankr. W.D. Wis. 1989).

[23] *GE Money Bank v. LaBovick (In re LaBovick)*, 355 B.R. 508, 515 (Bankr. W.D. Pa. 2006).

[24] *FCC Nat'l Bank v. Orecchio (In re Orecchio)*, 109 B.R. 285, 289 (Bankr. S.D. Ohio 1989), citing S. Rep. No. 98-65, 98th Cong. 1st Sess. 58 (1983).

[25] *In re Leaird*, 106 B.R. at 179.

[26] *In re Orecchio*, 109 B.R. at 290.

incurred in contemplation of his discharge in bankruptcy."[27] One commentator states, the presumption "can be overcome by evidence that the debtor experienced a sudden change in circumstances or that the debtor did not contemplate filing a bankruptcy petition until after the transaction took place."[28] However, the evidence needed to rebut the presumption need not rise to the same level of evidence needed for a creditor to establish nondischargeability under § 523(a)(2)(A), as the presumption does not ever shift to the debtor the ultimate burden to establish the absence of fraudulent intent.[29] The burden of persuasion remains on the creditor.[30]

Because the presumption satisfies the creditor's burden of production but not the creditor's burden of persuasion, if the debtor rebuts the presumption, the creditor must prove actual fraudulent intent under § 523(a)(2)(A). On the other hand, if the debtor's rebuttal is unbelievable or insufficient, the creditor is not required to prove intent under § 523(a)(2)(A) and the presumption of fraudulent intent and nondischargeability under § 523(a)(2)(C) remain.[31]

Other that the exclusion of "goods or services reasonably acquired for the support or maintenance of the debtor or a dependant of the debtor" in § 523(a)(2)(C), the Code does not define "luxury goods or services." It has been held that, as a matter of law, luxuries within the meaning of § 523(a)(2)(C) "are limited to things that constitute extravagances or self-indulgences."[32] "Considerations bearing upon whether or not an item is a luxury good include

---

[27] *In re LaBovick,* 355 B.R. at 515.

[28] 4 *Collier on Bankruptcy* ¶ 523.08[5]

[29] *In re LaBovick*, 355 B.R. at 515.

[30] *Id.*

[31] *In re Orecchio*, 109 B.R. at 290.

[32] *Shah v. Shaw (In re Shaw)*, 294 B.R. 652, 655 (Bankr. W.D. Pa. 2003).

11

the circumstances surrounding the purchase, whether the item serves a significant family function, and whether the purchase shows financial irresponsibility."[33] The price and function of the purchased items are considered.[34] These factors raise subsidiary questions, including the following:

> whether the purchase was new or used, whether it was a "de luxe" or basic model, whether it replaced an existing item that had outlived its usefulness or was a new acquisition, whether it was used in the ordinary activities of daily living, whether it was a gift, whether the debtor bought one or several such items, whether the store where the purchase was made could be considered "exclusive," and so forth.[35]

### C. The § 523(a)(2)(C) presumption applies but is rebutted by Debtor.

In this case, within the 60 days before filing the petition on October 11, 2005, Debtor used the credit card issued by Bank to purchase a stereo system on September 2, 2005, for $3,615.55 and a television on September 19, 2005 for $4,361.44. Debtor testified that the purchases were for family use. The Court finds that these were luxury goods for purposes of § 523(a)(2)(C). The primary basis for this finding is the price of the goods. The amount paid evidences the selection of de luxe models rather than a basic television set and stereo system. In addition, at the time of the purchases, Debtor's family was using older similar items, so the

---

[33] *Compass Bank v. Meyer (In re Meyer)*, 296 B.R. 849, 865 (Bankr. N.D. Ala. 2003).

[34] *Montgomery Ward and Co., Inc. v. Blackburn (In re Blackburn)*, 68 B.R. 870, 874 (Bankr. N.D. Ind. 1987).

[35] *Id.* (citing cases holding that the following are luxury goods: gift sets, cologne, fashion accessories, auto blanket, and coffee maker; a three-wheel recreational vehicle; a computer and auto parts; purchases of a watch and gifts at an exclusive establishment; three oriental-style throw rugs; several hundred items purchased on a trip to Europe; and candy and camera equipment. The following were identified as not luxury items: clothes, shoes, and boots; used vehicle, for which debtors traded their previous vehicle; set of china which was essential necessity in connection with plaintiff's station in life.)

12

purchases were upgrades, rather than essential purchases. Bank is therefore entitled to the presumption that $7,976.99 of the claim is nondischargeable.

However, as examined above, the application of the presumption does not end the inquiry as to these purchases. Debtor may rebut the presumption by showing substantial doubt as to the presumed intent. In this case, the Court finds that Debtor has rebutted the presumption that he acquired the stereo and television without intent to pay, as a "loading up" of a debt incurred in contemplation of bankruptcy. The purchases were made on September 2 and 19, 2005, before Debtor contacted bankruptcy counsel. On October 1, 2005, Bank received a check for the minimum payment due on October 14, 2005, as shown on the September statement.[36] This conduct is inconsistent with intent to purchase goods in contemplation of discharge in bankruptcy. Further, the evidence established that Debtor experienced a sudden change of circumstances when the sale of his restaurant fell through in late September, after the purchases. It was not until this event that Debtor realized that he would be unable to pay his credit card debt.

**D. Bank has not sustained its burden of proof for nondischargeability under § 523(a)(2)(A).**

Because the presumption has been rebutted, Bank bears the burden to establish nondischargeability under § 523(a)(2)(A) in accord with the elements stated above for the charges within 60 days of filing, just as it does for those made outside of 60 days for which the Code provides no presumption of nondischargeability. The first element, the making of a

---

[36] Although the check was returned for insufficient funds, there was no evidence that Debtor intentionally wrote a bad check.

13

representation, is satisfied.  As stated above, each time Debtor used the card he made a representation of intent to pay for the items purchased.

The second element requires Bank to prove that Debtor knew the representations to be false when made.  As examined above, the Debtor's intent may be inferred from the circumstances.  Several of the circumstances of this case indicate Debtor made the representation knowing it was false.  The charges were for substantial sums, Debtor had approximately $200,000 in credit card debt when he made the charges, Debtor's income was not sufficient to repay the debt, and the charges were made for luxury goods.  The evidence of insolvency is strong, but this is not sufficient to satisfy the Bank's burden.  On the other hand, several factors indicate the absence of fraudulent intent.  There were only four charges, and they were made over approximately a three month period of time.  The charges were insignificantly above the credit limit, there were not multiple charges on the same day, Debtor's restaurant was operating as unusual when the charges were incurred, and there is no evidence of a sudden change in Debtor's buying habits.  Further, the Court finds credible Debtor's testimony that he first realized that he could not pay his debt when the sale of the restaurant fell through, after the charges.  Debtor sent the minimum monthly payment to the Bank each month; such a payment history is inconsistent with intent to incur dischargeable debt.  Debtor did not contact bankruptcy counsel until after the charges were incurred and after it became obvious that the restaurant could not be sold and was in serious difficulty.  Based upon these findings of fact, the Court holds that Bank has not sustained is burden to show the falsity of  Debtor's implied representations that he intended to pay for the purchases each time he used the credit card.

The third element of the Bank's burden of proof is to establish that Debtor's representations of intent to pay were made with intent and purpose to deceive the Bank. The evidence relevant to this element overlaps the evidence the Court has found insufficient as to the second element. For the same reasons that the Bank has not shown that Debtor made a false representation when using the card, it has not shown that Debtor intended to deceive the Bank regarding his intent to pay.

Bank also fails to establish the element that it justifiably relied upon Debtor's implied representation that he intended to pay the charges. It is difficult to see how a credit card issuer can ever justifiably rely upon the implied representation made each time the card is used. Even if the focus were on justifiable reliance upon a representation to pay made at the time the card was issued, the evidence in this case would not support such a finding. The card was offered to Debtor by an employee of Ultimate Electronics. There is no evidence that Debtor supplied any financial information when completing the application. There is no evidence that Bank made any inquiry concerning Debtor's outstanding credit cards or his financial affairs before issuing the card. There is no evidence of a prior relationship between Debtor and Bank and no evidence that Bank was selective in the persons to whom cards were issued. Bank issued a card with a $10,000 limit, and Debtor used that credit. The Bank had at its disposal other procedures for extending credit which would have limited its risk, such as the obtaining from Debtor a written application including financial information, but apparently chose not to do so.

**CONCLUSION.**

The Court denies the Complaint and holds that claim of the Bank is dischargeable. Although the presumption of nondischargeability of § 523(a)(2)(C) applies to the purchases

15

made by Debtor within 60 days before the filing of the petition, Debtor's evidence rebutted that presumption. As to the charges incurred both within and before the 60 days prior to filing, Bank has failed to sustain its burden of proof on three of the elements required for nondischargeability under § 523(a)(2)(A). Bank did not prove by a preponderance of the evidence that Debtor's implied representations that he intended to pay for the items purchased were false when made, that such representations were made with intention and purpose of misleading the Bank, or that the Bank justifiably relied upon Debtor's representations.

The foregoing constitute Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based upon this ruling will be entered on a separate document as required by Federal Rule of Bankruptcy Procedure 9021 and Federal Rule of Civil Procedure 58.

**IT IS SO ORDERED.**

###